*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* SHAW, Minors.

UNPUBLISHED
June 15, 2023

Nos. 362752; 362753
Macomb Circuit Court
Family Division
LC Nos. 2022-000118-NA;
　　　　　2022-000119-NA

Before: RICK, P.J., and SHAPIRO and O'BRIEN, JJ.

PER CURIAM.

In these consolidated appeals,[1] the lawyer-guardian ad litem (LGAL), on behalf of the minor children AS and TS, appeals by right the trial court's order asserting jurisdiction over the children but, consistent with the findings of the referee, declining to find statutory grounds on which to terminate the parental rights of respondent-father and respondent-mother under MCL 712A.19b(3)(b)(*ii*), (g), (j), and (k)(*iii*). On appeal, the LGAL argues that the trial court clearly erred when it declined to find that there were statutory bases on which to terminate respondents' parental rights. We affirm.

## I. BACKGROUND

On May 20, 2022, the Department of Health and Human Services (DHHS) filed a petition seeking to terminate respondents' parental rights at the initial disposition. There is no dispute in this case that TS suffered severe injuries sometime prior to February 4, 2022. On the evening of February 4, 2022, respondent-mother brought TS into urgent care. TS was about four months old at the time. Respondent-mother reported that TS was sleeping more than normal and making abnormal rhythmic movements. TS also had significant swelling on her face, bruising around her right upper eye, was not blinking and was unresponsive to stimuli. Respondent-mother told staff members that a motorized baby swing had collapsed and fallen on TS the previous day. Staff members told respondent-mother to take TS to the nearest emergency room immediately.

---

[1] *In re Shaw Minors*, unpublished order of the Court of Appeals, entered September 7, 2022 (Docket Nos. 362752 and 362753).

Respondent-mother and respondent-father took TS to the Children's Hospital, where she was admitted to the pediatric intensive care unit. It was determined that TS had suffered severe injuries, including multiple skull fractures, neck and spinal ligament injuries and bleeding in or around the brain.

Respondents' explanation for TS's injuries, as told to the Children's Protective Services (CPS) specialist who filed the petition on behalf of DHHS, is as follows. Respondent-mother and respondent-father have opposite work shifts, meaning that they take turns watching their children. Respondents claim that TS was injured the evening of February 3, 2022 (the day before TS was taken to the hospital), while respondent-father was coming home from work and respondent-mother was in the shower getting ready for work. They claimed that the paternal aunt, a 16-year-old, came over to watch the children while respondent-mother got ready for work and walked into their apartment to find TS in a motorized baby swing that was pushed over or otherwise collapsed. Respondent-mother claimed that she placed TS in the swing before she got in the shower. Respondents claim that TS was in the swing when it collapsed and that the swing kept swinging, causing TS's injuries. Respondent-mother did not go to work the night of February 3, 2022, out of concern for TS. As described above, the symptoms TS exhibited the following day caused respondent-mother to take the child to urgent care.

At the combined adjudication trial and termination hearing, the family court referee heard testimony from a physician's assistant from the urgent care facility, the CPS specialist, Dr. Bradley Norat, and the foster-care case manager assigned to AS and TS. Dr. Norat, who is the Medical Director of the Child at Risk Evaluation Team at Children's Hospital, testified that TS's injuries were "highly concerning for nonaccidental trauma." According to Dr. Norat, in order to cause the kinds of injuries TS had suffered, the force would have had to be similar to a motor vehicle collision. TS's injuries indicated that she had been hit multiple times on the head, and there had to be a hyperflexion component to cause the injuries to her neck. Dr. Norat did not believe that the injuries were consistent with those that could be caused by a motorized baby swing. Norat stated that if TS had not received medical treatment, she would have died. The foster-care case manager testified that both children are currently placed with their maternal great aunt and uncle, who have been taking care of the children's needs. AS does not have any reported injuries or illnesses. However, TS needs to go to many doctor's appointments to receive specialized treatment for the lasting effects of her injuries.

The referee concluded that there were grounds to assume jurisdiction over the children under MCL 712A.2(b)(1) because TS's injuries occurred the day before she was brought into care, and it was "clear that there's been a delay in medical care for the child." However, the referee concluded that there was not clear and convincing evidence presented to terminate respondents' parental rights at that time under the statutory grounds alleged by DHHS in the amended petition. Addressing respondent-father, the referee concluded that he was at work when the injuries occurred, and there was no evidence that he caused the injuries or physically abused the children. The referee also found that there was no evidence that respondent-mother intentionally harmed the child, noting that there had been no criminal charges presented against respondents or an alternative theory presented as to how TS's injuries occurred. The referee also noted the lack of testimony from the aunt who the parents claimed found TS beneath the swing. The referee ordered that a parent-agency treatment plan be prepared and that DHHS immediately refer respondents for

psychological evaluations. Both DHHS and the LGAL filed requests for review of the referee's recommendation, and the trial court affirmed.

## II. DISCUSSION

The LGAL argues that the trial court clearly erred when it found that statutory grounds on which to terminate respondents' parental rights had not been established by clear and convincing evidence.[2] We disagree.[3]

Before it can terminate a respondent's parental rights, a trial court must find that there is clear and convincing evidence for at least one statutory ground for termination. *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020). Evidence is clear and convincing when it

> produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact-finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. [*In re Curry*, 505 Mich 989, 991 (2020) (alterations in original; quotation marks and citation omitted).]

DHHS requested that respondents' parental rights be terminated under MCL 712A.19b(3)(b)(*ii*),[4] (g), (j), and (k)(*iii*), which provide as follows:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:
>
> * * *
>
> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable

---

[2] DHHS has filed a brief in support of the LGAL's arguments on appeal.

[3] We review for clear error a trial court's ruling regarding whether statutory grounds for termination have been established. *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). A trial court's finding is clearly erroneous when "the reviewing court has a definite and firm conviction that a mistake has been committed." *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020) (quotation marks and citation omitted).

[4] The LGAL cites MCL 712A.19b(3)(b)(*i*) in her brief on appeal as the applicable ground for termination under that subsection. However, the amended petition filed on June 30, 2022, sought termination under MCL 712A.19b(3)(b)(*ii*), not MCL 712A.19b(3)(b)(*i*).

likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

* * *

(k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:

* * *

(*iii*) Battering, torture, or other severe physical abuse.

The LGAL and DHHS argue that the termination under these statutory grounds was proper because the evidence compels the conclusion that TS suffered multiple serious, nonaccidental injuries that were caused by at least one of the respondents. The LGAL and DHHS concede, however, that they lack evidence as to which parent was responsible and whether the other parent could have acted so as to protect the child.

According to respondents, at the time TS was injured respondent-father was on his way home from work and respondent-mother was in the shower, getting ready for work. They assert that the paternal aunt came to the apartment at this time to help care for the children and found the motorized swing collapsed on TS. Neither the DHHS nor the parents offered testimony from the paternal aunt so as to either contradict or support the events as described by respondent-mother. And we find no effort reflected in the record by either CPS or DHHS to contact the aunt to confirm or deny respondent-mother's version of events.

The LGAL and DHHS maintain that respondents' version of events is not plausible given Dr. Norat's testimony that the motorized swing would not have been able to cause the injuries sustained by TS. Assuming that TS's injuries were nonaccidental, as opined by Dr. Norat, the question becomes who caused TS's injuries. The LGAL and DHHS concede that there is no way of knowing at this stage of the proceedings, but maintain that termination of parental rights is nonetheless appropriate because even if one of the respondents did not cause TS's injuries themselves, they are covering someone else's transgressions. But this assumption is not necessarily correct. Again, under respondents' version of events, neither respondent was with TS

-4-

at the time of injury. And even assuming the harm was inflicted by one of the parents, there is not clear and convincing evidence that the other parent is covering up for the other. Thus, we agree with the trial court that termination at the initial disposition was premature.

The LGAL and DHHS alternatively argue that the delay in seeking medical care for TS alone justifies termination of respondents' parental rights. Respondents did not seek medical care for TS until about 24 hours after TS was purportedly found under the collapsed swing. The physician's assistant testified that when respondent-mother arrived at the urgent care facility she was extremely concerned for TS's well-being. Respondent-mother told the assistant that TS was sleeping more than normal and making abnormal rhythmic movements. The worker observed that TS had significant face swelling, she had bruising to her upper right eye, and she was unresponsive to stimuli. While it is fair to say respondents should have sought medical care for TS earlier, the record is not clear as to when these symptoms arose and whether they became progressively worse over time. Respondent-mother's statements to the physician's assistance indicate that TS did not begin exhibiting symptoms until the day after she was found under the collapsed swing, indicating that respondent-mother did not wait a full 24 hours after respondent noticed abnormal behavior from TS. Rather, the record indicates that as this behavior appeared and became more prominent, respondent-mother sought medical care. Accordingly, we cannot say that the trial court clearly erred by declining to terminate respondents' parental rights on the basis of medical neglect.

Respondents had no history of CPS involvement prior to the events at issue in this case and there are no indications that their other child, AS, has been abused. We acknowledge that TS has suffered severe injuries and there is expert testimony that the harm to TS was nonaccidental. However, the LGAL and DHHS concede that they do not know what happened to TS or even the identity of the alleged perpetrator. Further, it appears that the one alleged eye witness to the discovery of TS's injuries has not even been contacted by CPS or DHHS. Under these unusual circumstances, we are not left with a definite and firm conviction that the trial court erred by concluding that termination of respondents' parental rights was premature and that respondents should instead be offered the opportunity to participate in services and psychological evaluations.

Affirmed.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro